725 So.2d 996 (1998)
MONTGOMERY COCA-COLA BOTTLING COMPANY, LTD.
v.
Stanley E. GOLSON.
2971102.
Court of Civil Appeals of Alabama.
December 4, 1998.
*997 Frederick L. Warren of Ford & Harrison, L.L.P., Atlanta, GA; and Joseph T. Carpenter, Montgomery, for appellant.
Frank M. Wilson and Delacie C. Hester of Beasley, Wilson, Allen, Crow & Methvin, P.C., Montgomery; and David M. Tidmore of Vincent, Hasty, Sullivan, Elliott & Tidmore, P.C., Birmingham, for appellee.
Prior report: 680 So.2d 304.
HOLMES, Retired Appellate Judge.
Montgomery Coca-Cola Bottling Company, Ltd. (employer), appeals a judgment based on a jury verdict in favor of Stanley E. Golson on his claim of a retaliatory discharge.
Golson sued the employer, alleging wrongful termination of his employment in violation of Ala.Code 1975, § 25-5-11.1 The jury returned a verdict in favor of Golson and awarded him compensatory damages in the amount of $94,000 and punitive damages in the amount of $200,000. The trial court entered a judgment based on that verdict. The employer filed a motion for a judgment notwithstanding the verdict (JNOV),[1] for a new trial or, in the alternative, for a remittitur of the damages. The trial court denied the motion.
The employer appeals. This case is before this court pursuant to Ala.Code 1975, § 12-2-7(6).

JNOV: Retaliatory Discharge
The employer initially contends that the trial court committed reversible error in denying its motion for a JNOV because, it says, Golson failed to present substantial evidence of a retaliatory discharge.
In Coley v. Walker, 655 So.2d 1005, 1007 (Ala.Civ.App.1994), this court stated the following regarding a motion for a JNOV, challenging the sufficiency of the evidence:
"A post-judgment motion for JNOV, like a motion for a directed verdict presented during trial, is a procedural device used to challenge the sufficiency of the nonmoving party's evidence. The standard of review applicable to a motion for JNOV on appeal is identical to that used by a trial court in reviewing a motion for a directed verdict, and like a directed verdict, a JNOV is appropriate when the party with the burden of presenting evidence has failed to present substantial evidence in support of its position. When a trial court has denied a motion for a directed verdict, a motion for JNOV allows the court to reassess its prior decision. The ultimate question as to either motion is whether the party bearing the burden of proof has presented sufficient evidence to allow submission of the case or issue to the jury for resolution of the factual dispute. In reviewing a motion for JNOV, this court must view the evidence in a light most favorable to the party who secured the jury verdict and must consider those reasonable evidentiary inferences a jury could have drawn."
(Citations omitted.)
Section 25-5-11.1 states that "[n]o employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits...."
In Twilley v. Daubert Coated Products, Inc., 536 So.2d 1364, 1369 (Ala.1988), our supreme court stated the burden of proof *998 necessary to establish a retaliatory discharge claim filed pursuant to § 25-5-11.1:
"We hold that an employee may establish a prima facie case of retaliatory discharge by proving that he was `terminated' because he sought to recover worker's compensation benefits, which would be an impermissible reason. The burden would then shift to the defendant employer to come forward with evidence that the employee was terminated for a legitimate reason, whereupon the plaintiff must prove that the reason was not true but a pretext for an otherwise impermissible termination."
In the instant case, we conclude that Golson made a prima facie showing of a retaliatory discharge. In March 1993, Golson began working with the employer; in April 1993, he sustained an injury to his knee when a Coca-Cola machine fell on him; in April 1994, he filed a complaint for workers' compensation benefits; and in July 1994, the employer terminated his employment.
At trial the employer presented evidence that Golson's employment was terminated because of his inferior work and his disregard of his supervisor's instructions. Specifically, Golson's supervisor, Harold Hatchett, testified that Golson fell asleep during his work assignments, used the phone excessively, sat down more than he worked, did not complete assignments, disappeared from his work area, took prolonged breaks, and used the restroom excessively.
Golson, on the other hand, presented evidence from which a jury could infer that the reasons asserted by the employer were not true, but were merely a pretext for an otherwise impermissible termination. Specifically, Golson presented the following evidence: Prior to his injury, Golson had a good relationship with his supervisor, as well as his co-employees. After Golson returned to work, however, the employer assigned duties to him that exceeded his work restrictions, harassed him, and intimidated him to force him to voluntarily quit.
Willis Smedley, a co-employee who worked with Golson in the cooler department, testified that Golson was a hard worker and that Golson continued to move three-and four-hundred-pound Coca-Cola machines despite his injury and his work restrictions. Smedley further testified that he informed Hatchett, the cooler department supervisor, of Golson's severe pain and of Golson's inability to move the Coca-Cola machines. According to Smedley, Hatchett responded, "either shit or get off the pot, he will do it as long as I ask him to do it."
In June 1994, the employer transferred Golson to the production department. While on line four, Golson worked under the direct supervision of William Johnson. Johnson testified that Golson was an excellent worker, was not lazy, never fell asleep on the job, and never wandered away from the production line. Johnson further testified that two Coca-Cola managers, Richard Williams and Larry Jones, instructed Johnson to work Golson hard so that Golson would quit. Johnson testified as follows:
"Q. Did [Jones] ever discuss Stanley Golson with you at any time?
"A. Yes. One evening when he came in..., he asked me was I making sure I worked [Golson] hard.
"....
"Q. Wasn't this man on light duty from your understanding?
"A. Light duty at Coke is just a word really.
"Q. They were working him well beyond light duty?
"A. Yes.
"Q. And you are a supervisor. You know what light duty is, right?
"A. Yes.
"Q. Did [Jones] ever suggest to you or directly tell you to harass Stanley Golson and make his life tough?
"A. I was told by [Jones] and other people to run him away from there, help him to want to leave a little faster.

"Q. That's what you were told by supervisors over you?
"A. Yes.
"Q. What about [Williams]? Did you ever talk to [Williams]?

*999 "A. Yes. That's another one that told me to help run him away from there. Told me he was sent over there to work with us, and to work him as hard as I can, put as much [work as I want to on him].
"....
"A. That was the conversation, to run him off.
"Q. What did you think about that?
"A. It wasn't nothing to think about. It was just something said. That was the usual policy there. You work. If you can't work, run you on away from there.

"....
"Q. Did [Jones and Williams] ever take [Golson] from under your supervision because you wouldn't harass him enough?
"A. Yes. Shortly after [Golson] had caught on and was doing everything, I guess everybody was noticing I was leaving him running the line.... So I guess they figured he was catching on too easy over there and was doing too good a job or whatever, and the next thing I know, the next day he didn't come back. I asked where he was. I told them I wanted him to come over there and work permanent since I needed somebody. But I never [saw him again]."
(Emphasis added.)
Anthony Smith, a co-employee in the production department, corroborated Williams's testimony and opined that while Golson was in the production department, the employer continuously harassed Golson.
Golson also introduced his personnel file, which contained performance evaluations dated August 1993, and February 1994. Both evaluations were written by Hatchett, Golson's supervisor, indicating that Golson was doing a good job and recommending that he receive a pay increase. The evaluation forms indicated that Hatchett had been totally objective in evaluating Golson.
Despite Golson's good performance evaluations, however, at least thirty written warnings existed regarding his work habits. Golson testified that, besides one written warning for being five minutes tardy, he never received any written warnings or reprimands from the employer regarding his work habits. In fact, the evidence reveals that the employer did not keep these written warnings in Golson's personnel file, but, instead, kept them in a separate file in Hatchett's office. Moreover, the employee handbook stated that all supervisor-employee conferences were to be recorded by the supervisor and signed by the supervisor and the employee. Golson's signature did not appear on any of the written warnings.
Golson also introduced the testimony of three former employees, all of whom testified regarding their own personal experiences of being harassed and intimidated after suffering an on-the-job injury for which they sought workers' compensation benefits. The employer eventually terminated the employment of these employees.
Suffice it to say, after reviewing the evidence in a light most favorable to Golson, we conclude that he presented more than substantial evidence to allow the case to be submitted to a jury. In other words, the trial court properly denied the employer's motion for a JNOV, because the record is replete with evidence to support a jury verdict on Golson's claim of a retaliatory discharge.

JNOV: Punitive Damages
The employer further contends that it is entitled to a JNOV, because, it says, Golson failed to present clear and convincing evidence that the employer acted consciously or deliberately or engaged in oppression, fraud, wantonness, or malice in terminating Golson's employment.
In Gold Kist, Inc. v. Griffin, 657 So.2d 826, 830 (Ala.1994), our supreme court stated the following:
"In reviewing punitive damages awards, this Court must presume that the jury awarded the proper amount of punitive damages and may not disturb the verdict on the ground of insufficiency of the evidence unless it appears that the verdict was `plainly and palpably wrong and unjust.' Continental Eagle Corp. [v. Mokrzycki, 611 So.2d 313, 322 (Ala.1992)]."
As noted previously, Golson showed that before his injury, he was a well-liked, hard-working *1000 employee, who performed his job satisfactorily. After Golson returned to work, the employer began to harass Golson. Specifically, members of upper-level management began instructing Golson's supervisors to create an intolerable work environment in order to force Golson to voluntarily quit. Further, Golson introduced the testimony of three former employees, all of whom sustained on-the-job injuries, sought workers' compensation benefits, and were subsequently terminated. The testimony of these individuals suggests that the employer had a distinct practice and pattern regarding injured employees who had filed workers' compensation claims.
Our supreme court has emphasized that punitive damages are especially appropriate in retaliatory discharge cases, based on "the gravity of wrongfully depriving [the employee] of what was [his] livelihood, [and] ... the chilling effect of retaliatory discharges." Lozier Corp. v. Gray, 624 So.2d 1034, 1037 (Ala.1993).
Based on the jury's finding of a retaliatory discharge, it could have properly awarded punitive damages as punishment and as a deterrent.

Remittitur of Damages
The employer contends that it is entitled to a remittitur based on the excessiveness of damages.
In Hammond v. City of Gadsden, 493 So.2d 1374, 1378 (Ala.1986), our supreme court stated the following:
"The authority to disturb a jury verdict on the ground of excessive damages is one which should be exercised with great caution. However, a remittitur may be ordered in those cases where the court can clearly see that the verdict has been reached because of bias, passion, prejudice, corruption, or other improper motives. This Court is well aware that the trial court is in a better position to observe all the witnesses who testified and other incidents which are not reflected in the record."
(Citations omitted.)
In the instant case, Golson sought damages for his lost wages and mental anguish. Golson claimed that because of the wrongful termination, he became depressed, he had problems obtaining gainful employment, he could not pay his bills, his car was repossessed, he was evicted from his apartment, and he and his wife divorced. The jury awarded Golson $94,000 compensatory damages, which included $19,000 lost wages. Hence, we must assume that the jury awarded Golson $75,000 for his mental anguish.
"There is no fixed standard for ascertaining the amount of compensatory damages that may be awarded for emotional distress. The determination of how much to award is left to the sound discretion of the jury, subject only to review by the court for a clear abuse of that discretion." First Commercial Bank v. Spivey, 694 So.2d 1316, 1326 (Ala. 1997). In Spivey, our supreme court upheld an award of $1 million in damages, $500,000 of which represented compensatory damages for emotional distress.
Suffice it to say, we conclude that the jury's assessment of compensatory damages, under the circumstances, was consistent with the evidence that Golson presented at trial. Furthermore, the record is devoid of any evidence that the jury verdict was the result of juror bias, corruption, passion, prejudice, or improper motive. Hammond, supra.
The employer further sought a remittitur of the punitive damages. In BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the United States Supreme Court cited three "guideposts" for courts to utilize in reviewing an award of punitive damages: (1) the reprehensibility of the defendant's conduct; (2) the ratio between the award of punitive and compensatory damages; and (3) a comparison of the award of punitive damages to the civil or criminal penalties that could be imposed for comparable misconduct. Our supreme court determined that the new guideposts did not preclude a consideration of the earlier factors set forth in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986) and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). See BMW of North America, Inc. v. Gore, 701 So.2d 507 (Ala.1997).
*1001 Reprehensibility of the employer's conduct: As noted previously, Golson presented substantial evidence from which a jury could have inferred that the employer engaged in a distinct pattern of harassing, coercing, intimidating, and ultimately discharging employees who had filed for, and received, workers' compensation benefits for an on-the-job injury. Suffice it to say, this evidence supports a finding of reprehensibility on the part of the employer to support an award of punitive damages.
Ratio of punitive damages to compensatory damages: In Gore, supra, the United States Supreme Court emphasized that there are no precise measurements or yardsticks for determining whether an award of punitive damages is excessive. Specifically, the Court stated the following:
"Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.... In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis."
Gore, 517 U.S. at 582-83, 116 S.Ct. 1589 (citations omitted).
Based on the evidence presented regarding the employer's impermissible conduct, we conclude that an approximate 1 to 2 ratio is not unreasonable, i.e., 94,000 to $200,000. See Mead Coated Board, Inc. v. Dempsey, 644 So.2d 872 (Ala.1994) (1 to 2 ratio). See also Leak Stop, Inc. v. Keenon, 705 So.2d 479 (Ala.Civ.App.1997) (8.6 to 1 ratio).
Comparable sanctions: Suffice it to say, we are unable to address this guidepost, based on the absence of any civil or criminal sanctions for a retaliatory discharge. See Keenon, supra. In Keenon, this court elaborated as follows:
"In this case, the only remedy available to Keenon, and others similarly situated, is a civil action pursuant to Ala.Code 1975, § 25-5-11.1. The legislature has proposed no other sanction, civil or criminal, to effectuate the specific purpose of § 25-5-11.1 that employees be able to seek benefits without fear of reprisal. [Motion Indus., Inc. v. Pate, 678 So.2d 724 (Ala. 1996)]. Accordingly, we conclude that there is no meaningful comparison that can be made between the punitive damages award in this case and other sanctions imposed by the legislature. The absence of any other sanction leads us to conclude that no reduction of the punitive award is warranted under this `guidepost.'"
Keenon, 705 So.2d at 485.
Based on the foregoing, we conclude that the trial court properly denied the employer's motion for a remittitur of the damages in this case.

Evidentiary Rulings
The employer finally contends that the trial court abused its discretion in denying its motion for a new trial based on certain evidentiary rulings. Specifically, the employer contends that the trial court abused its discretion in allowing Golson to introduce the testimony of three pattern and practice witnesses. Specifically, the employer contends that there was no similarity between the actions involving the pattern and practice witnesses and the actions involving Golson.
We note that "a jury verdict is presumed to be correct and that this presumption is strengthened by the trial court's denial of a new trial." Gold Kist, Inc., 657 So.2d at 829.
In Ryan v. Acuff, 435 So.2d 1244, 1247 (Ala.1983), our supreme court stated the following:
"Trial judges have wide discretion to exclude or admit evidence even of minor probative value on issues litigated in the cases. The test is that the evidence must only shed light on the main inquiry, and *1002 not withdraw attention from the main inquiry."
Additionally, "[t]here is common law authority in this state that, for the purpose of showing negligence or other improper conduct, a party is entitled to prove matters of custom and usage." C. Gamble, McElroy's Alabama Evidence, § 84.01(2) (4th ed.1991) (emphasis added). Our supreme court has ruled that a plaintiff's claim of a retaliatory discharge "constitutes `other improper conduct' for which proof of the defendant's pattern and practice is admissible." Continental Eagle Corp. v. Mokrzycki, 611 So.2d 313, 319 (Ala.1992).
The trial court, in the instant case, heard arguments on the employer's motion to exclude the testimony of the three pattern and practice witnesses. The trial court also viewed the witnesses' affidavits and determined that they qualified as pattern and practice witnesses. In fact, after reviewing the witnesses' testimony, we find that the jury could have inferred from the testimony that the employer engaged in a distinct pattern of abuse regarding injured employees.
Moreover, the employer cross-examined the witnesses and provided its own testimony in rebuttal. Hence, we conclude that the testimony from the three witnesses did not unfairly prejudice the employer. Accordingly, we find no abuse of discretion.
The employer also contends that the trial court abused its discretion in excluding the testimony of Larry Jones to rebut the testimony of William Johnson. Suffice it to say, we have considered the employer's argument in this regard and conclude that any error would be harmless error. Rule 45, Ala. R.App. P.
Specifically, the record reveals that, several months prior to trial, Golson submitted a supplemental witness list, which identified Johnson as a witness. After Johnson had testified at trial, the employer sought to introduce Jones to rebut Johnson's testimony. Golson objected, because Jones was an unidentified witness. The trial court did not allow Jones to testify. We would note that the trial court had previously disallowed one of Golson's witnesses from testifying, because Golson failed to identify the witness during discovery. Hence, we find no abuse of discretion to warrant a new trial.
In light of the foregoing, the judgment based on the jury verdict is due to be affirmed.
The foregoing opinion was prepared by Retired Appellate Judge Richard L. Holmes while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala.Code 1975. AFFIRMED.
ROBERTSON, P.J., and YATES and MONROE, JJ., concur.
CRAWLEY and THOMPSON, JJ., dissent.
CRAWLEY, Judge, dissenting.
I conclude that the trial court erred by excluding the testimony of Larry Jones. Judge Holmes reasons that the trial court did not err in excluding the testimony because Jones was not on the employer's witness list; he notes that the trial court had excluded the testimony of a proposed witness for Golson because that witness was not on Golson's witness list. The employer offered Jones's testimony in rebuttal to the evidence offered by Golson that Jones had made certain statements. The employer did not know there was any reason to call Jones as a witness until Golson presented that evidence. I conclude that that evidence is relevant under Rules 401 and 402, Ala. R. Evid., as rebuttal evidence. The exclusion of that rebuttal evidence is reversible error. Ex parte B.B.S., 647 So.2d 709 (Ala.1994).
THOMPSON, J., concurs.
NOTES
[1] Rule 50, Ala. R. Civ. P., as amended effective October 1, 1995, renames the "motion for a directed verdict" and the "motion for a judgment notwithstanding the verdict" as a "motion for a judgment as a matter of law" and a "renewal of the motion for a judgment as a matter of law," respectively. The standard of review for a motion for a judgment as a matter of law is the same as for a motion for a directed verdict and a motion for a JNOV.